UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA

                -against-

MARTIN WEISBERG,

                Defendant.

**MEMORANDUM & ORDER**

08-CR-347 (NGG) (RML)

------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

      Defendant Martin Weisberg ("Weisberg") is charged with ten counts of wire fraud and one count of money laundering. (Ind. (Docket Entry # 1).) At issue in this memorandum and order is Weisberg's motion to dismiss the money laundering count, Count Eleven. (Docket Entry # 102.) For the reasons stated below, Weisberg's motion is denied.

**I.    BACKGROUND**

      The Government alleges the following facts. Certain related companies, collectively known as SIAM, appointed Weisberg, an attorney, to be the "escrow agent" for a $30 million escrow account, a position that included, among other things, depositing the money into either a non-interest-bearing bank account or an Interest on Lawyer Account ("IOLA"). (Id. ¶¶ 4, 6.)[1] Weisberg served as the escrow agent from August 11, 2006 until October 29, 2007. (Id. ¶ 5.) Weisberg informed SIAM that he would deposit the $30 million in the agreed-upon fashion. (Id. ¶ 7.) Instead, he "secretly" deposited the money into a non-IOLA interest-bearing account, resulting in the accrual of $1.6 million in interest during Weisberg's tenure as the escrow agent. (Id.) Weisberg transferred $1.3 million out of the escrow account and appropriated it for his own purposes. (Id. ¶ 8.) To conceal this misappropriation, he sent letters to SIAM misstating the

---

[1] An IOLA is an interest-bearing escrow account whose interest, under New York law, is to be remitted to a fund maintained for the purpose of legal assistance to people with low incomes. (Ind. ¶ 6.)

1

escrow account's balance and concealing the fact that it was earning interest that Weisberg "was using for his personal benefit." (Id. ¶ 9.)

In Count Eleven, the Government alleges that, as part of his alleged misappropriation of funds, Weisberg, on June 4, 2007, wired a $200,000 check to an entity "whose identity is known to the Grand Jury," in violation of 18 U.S.C. § 1957. (Id. ¶ 14.) There is no dispute that this $200,000 came from the escrow account. (Weisberg Mem. (Docket Entry # 103) at 3.)

## II.   LEGAL STANDARD

"[A]t any time while the case is pending," the court may hear a motion to dismiss claiming that the indictment fails "to state an offense." Fed. R. Crim. P. 12(b)(3)(B). In deciding such a motion, the district court must consider only whether the indictment's allegations, taken as true, are sufficient to establish a violation of the charged offense. See United States v. Sampson, 371 U.S. 75, 78-79 (1962).

## III.   DISCUSSION

### A.   The Money Laundering Statutes: 18 U.S.C. §§ 1956(a)(1) and 1957

Under 18 U.S.C. § 1957(a), under which Weisberg is charged, a person commits a crime when he "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000," where that property is in fact "derived from specified unlawful activity." See United States v. Ness, 565 F.3d 73, 78 (2d Cir. 2009) ("To prove a violation of § 1957(a), the government must present evidence that the defendant knowingly engaged or attempted to engage in a monetary transaction in unlawful funds."). There is no dispute that the wiring of $200,000 alleged in Count Eleven was a "monetary transaction" of a value greater than $10,000. Nor is there any dispute that the unlawful activity in question constituted "specified unlawful activity," as defined in the statute. The only dispute

2

is over whether the monetary transaction was "*in criminally derived property*." Under the statute, "'criminally derived property' means any property *constituting, or derived from,* proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2) (emphasis added).

Weisberg's motion stems from the thorny problem of how the Government can prove that a given transaction was "in criminally derived property" where the bank account in question contains both "clean" money—that is, money obtained legitimately—and "dirty" money—that is, "proceeds obtained from a criminal offense." There is no dispute that, taking the facts alleged in the indictment as true, the SIAM account contained $30 million in "clean" money—the funds SIAM entrusted to Weisberg—and that the ill-gotten interest amounted to $1.6 million in "dirty" money. Where, as here, the account in question contains commingled clean and dirty money, and in light of the fungibility of money, how can the Government prove that a particular transaction was "in" dirty money, under § 1957? The Second Circuit has not addressed this issue, and the other Circuit Courts of Appeals have reached contradictory conclusions.

Before discussing the law of the other circuits as to § 1957, it is helpful to discuss 18 U.S.C. § 1956(a)(1). Both statutes prohibit "money laundering," but the latter involves that crime in the classically understood sense. Under § 1956(a)(1), a person commits a crime where that person, "knowing that the property *involved* in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact *involves* the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1) (emphasis added). To violate § 1956(a)(1), the person must also have a specific mens rea in carrying out the "financial transaction": he must either have "the intent to promote the carrying on of specified unlawful activity" or the intent to engage in tax evasion, or he must carry out the transaction "knowing that [it] is designed in whole or in part [] to conceal or

3

disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or [] to avoid a transaction reporting requirement under State or Federal law." Id. § 1956(a)(1)(A), (B). Thus, to violate § 1956(a)(1), a person must conduct a financial transaction that "involves" the proceeds of a crime, knowing that the transaction "involves" such proceeds, with the further knowledge or intent that the transaction promote or conceal unlawful conduct.[2]

Where the funds in a financial transaction charged under § 1956(a)(1) come from a bank account containing commingled clean and dirty money, courts have uniformly held that the Government need not "trace" the funds used in the transaction to the charged unlawful conduct. See United States v. Braxtonbrown-Smith, 278 F.3d 1348, 1353 (D.C. Cir. 2002) (citing cases from the Third, Fourth, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits). In other words, there is no presumption, in § 1956(a)(1) cases, that "withdrawals from a commingled account are withdrawals of [] 'clean money.'" Id. at 1352. In reaching this conclusion, the D.C. Circuit in Braxtonbrown-Smith relied on § 1956(a)(1)'s use of the word "involve," noting that "money need not be derived from crime to be 'involved' in it; perhaps a particular sum is used as the bankroll facilitating the fraud." Id. at 1353 (quotation marks omitted). In other words, whether or not the money used in the particular charged transaction is itself considered clean or dirty, where there is a commingled account, and where the clean money facilitates the existence or concealment of the dirty money, the charged transaction can be said to have "involved" dirty money.[3]

---

[2] 18 U.S.C. § 1956(a)(2) involves international money laundering, and § 1956(a)(3) involves money laundering "stings."

[3] Similarly, in the context of criminal forfeiture under 18 U.S.C. § 982, "[t]he term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or *used to facilitate* the money laundering offense." United States v. Schlesinger, 396 F. Supp. 2d 267, 271

4

The Braxtonbrown-Smith court also noted that

> [t]he risk of unduly harsh consequences that Braxtonbrown-Smith maintains could occur in the absence of a tracing requirement is mitigated by the statute. Under § 1956(a)(1)(A), the government must prove that the defendant, first, knew that the transaction "represents the proceeds" of unlawful activity, and, second, intended either to promote the "carrying on of a specified unlawful activity" or "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." After multiple transactions, then, the government will have a difficult burden to prove the second intent for recent transactions based on proof of a single unlawful dollar deposited long ago.

Id. at 1354.

Thus, the D.C. Circuit in Braxtonbrown-Smith reached its holding that "tracing" is not required under § 1956(a)(1) by highlighting two elements of that statute that distinguish it from § 1957. First, under § 1956(a)(1), the money used in the financial transaction in question must simply "involve" the proceeds of unlawful conduct, whereas under § 1957, the transaction must be "*in* criminally derived property." Second, § 1956(a)(1) requires the Government not only to prove that the defendant knew that the money "involved" unlawful proceeds, but also to prove a second mens rea—knowledge or intent that the transaction promote or conceal further unlawful conduct. Section 1957 requires only that the defendant know that the money "in" the transaction is "criminally derived." No further mens rea is necessary.

B.   **The Circuit Courts' Approaches to Commingled Accounts Under § 1957**

The distinctions between the two money laundering statutes discussed in the previous section also informed the Ninth Circuit's reasoning in United States v. Rutgard, 116 F.3d 1270 (9th Cir. 1997). There, the court held that the Government, though it need not "trace" unlawful proceeds in § 1956(a)(1) cases, must do so in § 1957 cases. The defendant in Rutgard was a

---

(E.D.N.Y. 2005) (emphasis added); see also In re 650 Fifth Ave. and Related Properties, 777 F. Supp. 2d 529, 562-64 (S.D.N.Y. 2011) (same).

5

doctor who committed fraud and who was charged under § 1957 in connection with wire transfers of approximately $7.5 million made from a trust account he controlled. Id. at 1290. About $8.5 million had been deposited into the account, of which only $46,000 constituted fraud proceeds. Id. at 1290, 1292. The court held that, because more than $46,000 remained in the account at the time of the wire transfers, the transfers "did not necessarily transfer the $46,000 of fraudulent proceeds." Id. at 1292. The Rutgard court explained that § 1957 "does not create a presumption that any transfer of cash in an account tainted by the presence of a small amount of fraudulent proceeds must be a transfer of these proceeds. Unlike § 1956(a)(1), § 1957 does not cover any funds 'involved.'" Id. at 1292-93. Thus, the court found, where a bank account contains significantly more clean than dirty money, a transfer from that account cannot be presumed to be "in criminally derived property" under § 1957.

In United States v. Hanley, 190 F.3d 1017 (9th Cir. 1999) (superseded by regulation on other grounds, as stated in United States v. Martin, 278 F.3d 988, 1003 (9th Cir. 2002)), the Ninth Circuit summarized its holding in Rutgard as follows: "Because there remained *more than* $46,000 in the defendant's bank account on the date of the allegedly illegal transfers, the government had not proved beyond a reasonable doubt that the $7.5 million transfer included the criminally derived funds." Id. at 1025 (emphasis in original). The Hanley court extended the Rutgard rule beyond situations where the account contains only a "small amount" of dirty money. Unlike in Rutgard, the "great majority" of the funds in the account at issue in Hanley were derived from fraud. Id. Nevertheless, the court found that the Government could not rely on a presumption that a transfer out of the account contained dirty money, at least to the extent that there was enough clean money remaining in the account to cover it. Id. at 1025-26.

The rule in the Fifth Circuit is similar: a defendant can only be found guilty under § 1957 where his aggregate withdrawals from a commingled account exceed the amount of clean money in that account. United States v. Davis, 226 F.3d 346, 357 (5th Cir. 2000); see also United States v. Loe, 248 F.3d 449, 467 (5th Cir. 2001) (reversing § 1957 conviction where the aggregate amount of money transferred out of a commingled account was less than the amount of clean money remaining therein, such that "there was enough clean money in the account to cover the [] transfer").

In contrast, in the Third and Fourth Circuits, the Government *can* rely on a presumption that a transfer from a commingled account contains dirty money, at least up to the amount of dirty money present in the account. See United States v. Farrington, 58 F. App'x 919, 923 (3d Cir. 2003) ("Any debits from the account are presumed to be tainted up to the amount of $20,000, the value of the tainted funds credited."); United States v. Sokolow, 91 F.3d 396, 409 (3d Cir. 1996) (under § 1957, there is no "requirement that the government trace the funds constituting criminal proceeds when they are commingled with funds obtained from legitimate sources"); United States v. Moore, 27 F.3d 969, 976-77 (4th Cir. 1994) ("[I]it may be presumed . . . , as the language of section 1957 permits, that the transacted funds, at least up to the full amount originally derived from crime, were the proceeds of the criminal activity or derived from that activity.").[4]

---

[4] The Eighth and Tenth Circuits have also stated that the Government need not "trace" money in a financial transaction involving a commingled account to prove a violation of § 1957. See United States v. Pizano, 421 F.3d 707, 723 (8th Cir. 2005); United States v. Mooney, 401 F.3d 940, 946 (8th Cir. 2005); United States v. Johnson, 971 F.2d 562, 570 (10th Cir. 1992). However, the Eighth and Tenth Circuits, in upholding § 1957 convictions, have noted that the Government, beyond simply relying on a presumption that withdrawals from commingled accounts are dirty, has also proved facts leading to the strong inference that the transfer in question contained tainted funds. See United States v. Shafer, 608 F.3d 1056, 1067 (8th Cir. 2010) (holding that jury could reasonably conclude that the transaction used dirty money where the defendants had "limited legitimate income," had made "significant cash purchases," and had engaged in "extensive drug distribution and cash dealings"); Pizano, 421 F.3d at 722-23 (jury could

C.    The Second Circuit's Analysis in <u>Banco Cafetero</u>

The different approaches described above correspond to various "accounting" methods illustrated—in the context of criminal forfeiture of narcotics proceeds under 21 U.S.C. § 881—by the Second Circuit in <u>United States v. Banco Cafetero Panama</u>, 797 F.2d 1154 (2d Cir. 1986). In <u>Banco Cafetero</u>, the Second Circuit addressed the issue of whether funds held in an account containing both drug proceeds and clean money could be forfeited. <u>Id.</u> at 1158-1161. The court noted that "[t]hree basic approaches appear to be possible." <u>Id.</u> at 1159. The court called the first approach "drugs-in, last-out." <u>Id.</u> In other words, "[i]f $100 from a drug sale is deposited into an active account, . . . the account [is] 'traceable proceeds' to the extent of $100 as long as the account balance never falls below that sum." <u>Id.</u> That is, the $100 of dirty money is considered to remain in the account despite withdrawals, as long as the account's balance does not fall below $100. This corresponds to the approach to § 1957 taken by the Ninth and Fifth Circuits. Under the second approach, courts could "consider 'traceable proceeds' to be a pro rata share of any withdrawal from the account . . . , the share determined by the ratio of the $100 tainted deposit to the funds in the account immediately after the deposit." <u>Id.</u>[5] The <u>Banco</u>

---

have concluded that transactions were "criminally derived" where the evidence showed that the defendant could not have saved enough clean money to cover the transactions); <u>United States v. Pennington</u>, 168 F.3d 1060, 1066 (8th Cir. 1999) ("Here, the timing and amounts of Oldner's payments to Pennington permitted a reasonable jury to find that these payments were a portion of Oldner's proceeds from the scheme to defraud."); <u>Johnson</u>, 971 F.2d at 570 (Government presented evidence that all the money deposited into the account in question was dirty, except for 1.2% of the account, whose source "could not be determined").

The Seventh Circuit purports to "adopt[] the Fourth and Fifth Circuit approaches," <u>United States v. Haddad</u>, 462 F.3d 783, 792 (7th Cir. 2006) (citing <u>Davis</u> and <u>Moore</u> with approval), even though those approaches are inconsistent. In fact, the <u>Haddad</u> court's holding is consistent with the Fifth Circuit's, as stated in <u>Davis</u>: the <u>Haddad</u> court upheld a conviction under § 1957 where "the government proved aggregate withdrawals of far more than $10,000 above the amount of clean funds available" in the commingled account. <u>Id.</u>

[5] The Fifth Circuit in <u>Loe</u> noted in dicta that "[t]here is much to be said in favor of a 'proportionality' rule," like the second approach described in <u>Banco Cafetero</u>. <u>Loe</u>, 248 F.3d at 467 n.81. "However," the Fifth Circuit found, "as the <u>Davis</u> rule is binding on this panel, we must apply it to the case at bar, leaving

8

Cafetero court called the third possible approach "drugs-in, first-out." Id. Under such an accounting rule, courts would "consider 'traceable proceeds' to be any one withdrawal . . . to the extent of $100." Id. This corresponds to the approach to § 1957 taken by the Third and Fourth Circuits.

The Banco Cafetero court held that, in seeking to forfeit funds from a commingled account, the Government could rely on either the first or third approaches (the Government did not seek to rely on the pro rata rule). Id. at 1159-61. In commingled account cases, the court found,

> there is a plausible argument to be made *either* that the account contains the "traceable proceeds" of the tainted deposit . . . *or* that any withdrawal (in excess of the tainted deposit) contains the "traceable proceeds" of such a deposit. Which approach reflects reality in any particular case will depend on the precise circumstances. . . . [T]he real question therefore becomes which side bears the risk of the inevitable uncertainty that will arise in most cases.

Id. at 1159-60 (emphasis in original). The court went on to note that, in the forfeiture context, Congress had "answered that question in the Government's favor by assigning it a lenient burden of proof," namely, "probable cause for forfeiture." Id. at 1160.

> In almost all [commingled account] cases, . . . there will be probable cause to believe that the bank account contains "traceable proceeds" of the sale . . . *and* probable cause to believe that a withdrawal contains such "traceable proceeds" (if the withdrawal exceeds the deposit). The burden will then be on the claimant to demonstrate that no portions of the account or no portions of the withdrawal, depending on which the Government pursues, are "traceable proceeds" of the drug sale. No doubt uncertainty caused by the fungibility of money will make it difficult and in many cases impossible for claimants to satisfy this burden. But it is precisely the function of burden of proof rules to determine which party loses where evidence is lacking or at best ambiguous.

Id. at 1160-61 (emphasis in original).

---

change to a case appropriately before the en banc court." Id. (citation omitted). Though the proportionality rule has intuitive appeal, no court has applied it in the § 1957 context, and the court will not do so here.

In deciding whether to dismiss Count Eleven in the instant case, the court applies the Second Circuit's analysis in Banco Cafetero—with the important caveat that, unlike in the forfeiture context, the burden remains at all times on the Government to prove a violation of § 1957 beyond a reasonable doubt. The Government may not simply choose, as suits its needs, between a "dirty-money-in, first-out" rule and a "dirty-money-in, last-out" rule. To prove a violation of § 1957, it is not enough for the Government to demonstrate "probable cause" that the financial transaction in question was "in" dirty money—it must prove that element beyond a reasonable doubt. Therefore, the court finds that the approach taken by the Ninth and Fifth Circuits is more consistent with the allocation of the burden of proof in criminal cases than that taken by the Third and Fourth Circuits. That is, unlike in the forfeiture context, the Government may not rely on a presumption that a withdrawal from a commingled account is a transaction "in" dirty money.

The difference between § 1957, where the Government cannot rely on such a presumption, and § 1956(a)(1), where it can, is justified by the different language used in the two statutes. Under § 1956(a)(1), the Government need only prove that the transaction "involve[d]" dirty money. 18 U.S.C. § 1956(a)(1). Under § 1957, the Government must prove that the transaction was "in" dirty money. Id. § 1957(a).[6]

---

[6] If the Government could rely on a presumption that a withdrawal from a commingled account was "in" dirty money, a defendant could be held liable under § 1957 if he deposited $10,000 in dirty money into an account twenty years before his indictment, and if, after that deposit, the account legitimately grew to $100,000 (purely as a result of independent, clean deposits), from which the defendant made an otherwise legal $20,000 withdrawal. In such a scenario, the only act committed with criminal intent would have been the twenty-year-old dirty deposit. Nevertheless, the Government would be able to charge the defendant, since the $20,000 withdrawal would have taken place within the five-year statute of limitations. See 28 U.S.C. § 3282 (establishing five-year statute of limitations for non-capital cases). Such a harsh result is avoided in § 1956(a)(1) cases, because of the requirement of additional, criminal intent at the time of the financial transaction. See Braxtonbrown-Smith, 278 F.3d at 1354 (because of additional criminal intent element in § 1956(a)(1), "the government will have a difficult burden to prove the second intent for recent transactions based on proof of a single unlawful dollar deposited long ago").

However, these observations do not mandate the dismissal of Count Eleven, in light of the particular facts of the instant case. The Second Circuit found in Banco Cafetero that, despite the fungibility of money, it is possible to prove that a particular withdrawal from a commingled account includes, or does not include, tainted proceeds:

> For example, if a depositor placed a $175 check from his automobile insurer in payment of a damage claim into an account that contained $100 from a drug sale and the next day paid a $175 bill for car repairs, a fact-finder would be entitled to conclude that the $175 withdrawal did not contain "traceable proceeds" of the drug transaction but solely the "traceable proceeds" of the insurance payment, with the tainted deposit remaining in the account.

Banco Cafetero, 797 F.2d at 1160. The court held that, given the allocation of the burden of proof in the forfeiture context, the claimant was required to present such particular facts to rebut the presumption of "dirtiness" upon which the Government was entitled to rely. The opposite is true in the criminal context: the Government must prove particularized facts that the transaction in question was "in" dirty money in order to rebut the presumption that, to the extent there was sufficient clean money in the account to cover the transaction, the transaction was clean.

The court declines to find, at this stage, that the Government will be unable to meet this burden at trial. The Government alleges in the indictment that $1.6 million in unlawful interest accrued on the $30 million SIAM escrow account, $1.3 million of which Weisberg misappropriated. (Ind. ¶¶ 4-8.) The § 1957 charge appears to be based on one $200,000 transaction that formed a part of this $1.3 million misappropriation. (Id. ¶ 14.) Significantly, the Government alleges that Weisberg sought to conceal from SIAM that the account was earning interest, and that he was using this interest for his personal benefit. (Id. ¶ 9.) Under the most natural reading of the allegations in the indictment, taken as true, it must be concluded that the $30 million in "clean" money remained in the account—money SIAM expected to be there— while any withdrawals Weisberg made for his personal benefit were drawn from the "dirty"

11

portion—i.e., the $1.6 million in interest, of which SIAM was unaware. To meet its burden of proof under this theory, of course, the Government would have to prove that the $200,000 check was written without SIAM's approval. If SIAM *did* approve of the $200,000 withdrawal, it would be bizarre to conclude that it was "in" dirty money—instead, the natural conclusion would be that it came from the $30 million in clean money, of which SIAM was aware.

In sum, the Government may not rely on a presumption that money withdrawn from a commingled account contains dirty money. However, taking the allegations in the indictment as true, the court finds that the Government may nevertheless be able to prove a violation of § 1957 beyond a reasonable doubt by presenting particularized facts showing that the $200,000 Weisberg allegedly wired originated in the $1.6 million in "dirty" money present in the escrow account.

## IV.   CONCLUSION

For the aforementioned reasons, the court DENIES Weisberg's motion to dismiss Count Eleven of the indictment.

SO ORDERED.

Dated: Brooklyn, New York
September *14*, 2011

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge