UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X
UNITED STATES OF AMERICA

                                                            **MEMORANDUM & ORDER**
                                                            08-CR-347 (NGG) (RML)

-against-

MARTIN WEISBERG,

                Defendant.
----------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

        There are two motions in-limine before the court. On March 2, 2012, the government filed a motion in-limine to preclude the defendant, Martin Weisberg, from referring at trial to Jon M. Knight's 2004 conviction for First Degree Attempted Grand Larceny in New York Supreme Court. (See Docket Entry # 160.) A week later Weisberg, cross-moved to preclude the government from introducing a variety of evidence that he claims to be of little probative value and much prejudicial risk. (See Docket Entry # 170.)

        The government's motion in-limine is GRANTED. Weisberg is precluded from presenting evidence, asking questions, or making any reference to Jon M. Knight's criminal conviction. If he can lay the proper foundation, however, Weisberg may cross-examine certain government witnesses about an order of the United States Securities and Exchange Commission ("SEC Order") that bars Jon M. Knight from association with "investment advisors," and the witnesses' role, if any, in helping Jon M. Knight circumvent the that order. Before Weisberg can engage in this line of inquiry, he must establish a reasonable basis for the witnesses to believe that Jon M. Knight was violating the terms and conditions of the SEC Order. This may require a legal showing that SEC Order actually barred Jon M. Knight from associating with SIAM and its

1

affiliates.

Weisberg's motion in-limine is GRANTED in part and DENIED in part without prejudice. It is granted to the extent that the government shall redact those portions of Government Exhibit 59 that the parties agree are irrelevant to the factual issues before the jury; and it is denied without prejudice as to the remainder of the motion.

The court addresses the government's motion first.

Jon M. Knight ("Knight, Sr.") is the father of Jayme Colter and Jonathon Knight ("Knight, Jr."), who are officers of the victims of Weisberg's alleged fraud—SIAM Capital Management, Ltd and two affiliated entities. According to the government, Colter and Knight, Jr. will be among the witnesses called to testify at trial. (See Gov't Mot. in-Limine (Docket Entry # 160) at 1.) Knight, Sr. is a convicted felon. In 2004, he pled guilty to Attempted Grand Larceny in the First Degree (Weisberg Ltr. of Mar. 28, 2012, Ex. A (Docket Entry # 184-1)), apparently for his role in a ponzi scheme, see In re Jon M. Knight, 380 B.R. 67 (Bank. M.D. Fla. 2007). As a result of his conviction, the United States Securities and Exchange Commission issued an order pursuant to § 203(f) of the Investment Advisors Act of 1940 ("Investment Act" or "Act") barring Knight, Sr. "from association with any investment adviser." (See Weisberg Ltr. of Mar. 28, 2012, Ex. B (Docket Entry # 184-2).)

The government argues that evidence of Knight, Sr.'s conviction is irrelevant to any fact of consequence in determining Weisberg's guilt for wire fraud and money laundering. (See Gov't Reply (Docket Entry # 185) at 2 (citing Fed. R. Evid. 402).) In the alternative, the government argues that even if the evidence of the conviction does bear on a consequential fact, the evidence is more prejudicial than probative because of the risk that it will improperly tarnish

Knight, Jr.'s and Colter's reputations through guilt-by-association. (See id. (citing Fed. R. Evid. 403).)

Weisberg maintains that evidence of Knight, Sr.'s conviction is needed to properly impeach the testimony of Knight, Jr., Colter, and other government witnesses affiliated with SIAM. He argues that the government's case will rest on the credibility of these witnesses. (Weisberg Ltr. of Mar. 28, 2012 at 3.) They will testify that Weisberg's actions related to the escrow account were unauthorized. (Id.) Weisberg will argue that his actions were authorized. Weisberg contends that he must be allowed to introduce evidence of dishonest acts by the witnesses if he is to undermine their credibility. (Id.) It is here that Knight, Sr.'s conviction becomes potentially relevant. According to Weisberg, although he held no official position within the company, Knight, Sr. was SIAM's "de facto principal" (Weisberg Ltr. of Apr. 10, 2012 (Docket Entry # 189) at 1) and "principal-decision maker" (Weisberg Ltr. of Mar. 28, 2012 at 2). The theory is that, because the SEC Order prevented Knight, Sr. from holding office at SIAM, he inserted his children, Knight, Jr. and Colter, as "nominal officers and directors," to serve as his proxies. (Id. at 3.) By allowing Knight, Sr. to operate SIAM from behind the scenes, the argument goes, Knight, Jr., Colter, and the other SIAM witnesses helped Knight, Sr. circumvent the SEC order. Weisberg argues that this "aiding and abetting" (id.), if not itself criminal, certainly constitutes dishonest conduct about which the witnesses may be properly cross-examined.

There are two main problems with Weisberg's theory. First, it is not clear that it is factually supported. And second, if there is a foundation for impeaching the government witnesses on the basis of Knight, Sr.'s role at SIAM, the theory does not explain why the jury

3

needs to know about Knight, Sr.'s conviction rather than just the SEC Order.

The parties do not agree on the facts relevant to Weisberg's proffered line of cross-examination. The government disputes Weisberg's assertion that Knight, Sr. played a significant role in SIAM's management. (See Gov't Reply at 1-2.) While conceding that Knight, Sr. did "on occasion" provide consulting services to SIAM (Gov't Mot. in-Limine at 1), the government asserts that "there is no good faith evidentiary basis" for the assertion that the SIAM's officers, directors, and employees were a "sham, or in any way provid[ed] 'cover' for Jon M. Knight" (Gov't Reply at 2). It also claims that there would have been no need for Knight, Sr. to create the front Weisberg alleges because the SEC Order would not have prevented Knight, Sr. from associating with SIAM. The government argues that, since SIAM was an offshore entity doing business offshore, it was outside the Security and Exchange Commission's jurisdiction and therefore the order would not have affected Knight, Sr.'s role with company.

With respect to Knight, Sr.'s actual involvement with SIAM's day-to-day operations, it is not possible to discern which party's version of the facts is more accurate. Clearly, Knight, Sr. played a role in retaining Weisberg to represent SIAM. In an email to Weisberg dated June 27, 2006, Knight Sr. wrote:

> Dear Marty, Very nice to meet you today on the phone. Thomas recommends you very highly. In terms of your retainer, and in all actions, I am only acting as agent for the principals in the negotiation and, if (hopefully not) necessary, litigation. Your lead client will be SIAM Capital Management . . ..

(Weisberg Ltr. of Apr. 10, 2012, Ex. C (Docket Entry # 86-3) at 3.) Knight, Sr.'s involvement in other aspects of Weisberg's relationship with SIAM, however, remains undocumented. Weisberg claims that Knight, Sr. came to New York in July 2006 to meet with Weisberg and

4

Richard DePalma, that he came again in October 2006, and that he "was on all of strategy conference calls and e-mails with Messrs. Weisberg and DePalma." (Weisberg Ltr. of Mar. 28, 2012 at 2.) Likewise, Weisberg asserts that it was Knight, Sr., not his children or other SIAM officials, who negotiated Weisberg's repayment of the interest removed from the escrow account. (Id.) None of these allegations is directly supported by the record. Instead, Weisberg points to his billing records from Baker & McKenzie, along with those of Peter Ginsberg, to show that both lawyers had some contact with either "J. Knight" (Weisberg Ltr. of Apr. 10, 2012, Ex. A (Docket Entry # 86-1)) or "JK" (id., Ex. B (Docket Entry # 86-2)). The problem, of course, is that there are two "J. Knights" and two "JKs" to whom the records could be referring. Absent an affidavit or testimony from Ginsberg, Weisberg, or Richard DePalma (whose entries also appear on the Baker & McKenzie time sheet), it is impossible to know if the lawyers were dealing Knight, Sr. or his son, Knight, Jr.

There is also some question as to the scope and effect of the SEC Order.[1] The Investment Act defines "investment advisor" as

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, who, for compensation and as part of regular business, issues or promulgates analyses or reports concerning securities."

15 U.S.C. § 80b-2(a)(11). The record does not, at present, contain enough evidence about SIAM's business for the court to discern whether SIAM is an "investment advisor" for the

---

[1] While Weisberg's theory of impeachment turns on Knight, Sr.'s and the witnesses' understanding of the SEC Order, not the order's actual effect, their understanding would have been informed by a reasonable interpretation of the order. That is, it is more likely that Knight, Sr. and the witnesses would believe that Knight, Sr. was barred from associating with SIAM if he was, in fact, barred.

5

purposes of the Act. Furthermore, the extra-territorial effect of the Investment Act and administrative orders under the Act is not clear from the face of the statute. Cf. 15 U.S.C. §§ 80b-2(a)(11) and 80b-3(f) (not distinguishing between foreign and domestic investment advisors or the location of investment advisors' counter-parties). Neither party has provided any legal authority that would assist the court in resolving this question.

Finally, even assuming that Knight, Sr. was the power behind the throne at SIAM and that he was forced to the background only because of the SEC Order, it remains unclear why evidence of Knight, Sr.'s conviction is needed to impeach the government's witnesses. Evidence of the SEC Order is by itself sufficient. After all, Weisberg accuses Knight, Sr. of violating the order, not any terms or conditions of his conviction. Moreover, the evidence of the conviction could be unfairly prejudicial. It could allow Weisberg to imply to the jury that, notwithstanding any evidence that he violated the law, he is less culpable because the victims of his fraud were themselves criminals. Depending on what type of other evidence Weisberg intends to introduce, this could be a tempting inference. Thus, because it is not probative of the government witnesses' credibility and because it could unfairly prejudice the government's case, evidence of Knight, Sr.'s conviction is precluded under Rule 403 of the Federal Rules of Evidence.

Weisberg may introduce evidence of the SEC order, however, if he can lay a foundation for doing so. Weisberg may establish this foundation by showing, by a preponderance of the evidence, that a reasonable person in the witnesses's position would believe that Knight, Sr.'s involvement with SIAM violated the SEC Order. Such a showing may include evidence of Knight, Sr.'s activities with SIAM and its affiliates, as well as evidence of the relevant law. This latter type of evidence could include statutes, rules, and cases that indicate whether the SEC

Order in fact banned Knight, Sr. from associating with SIAM or its affiliates.

With respect to Weisberg's motion in-limine, it is premature to rule on most of the evidentiary issues raised therein.

Weisberg seeks to: (1) prevent certain witnesses from testifying about his allegedly abusive treatment of secretaries and staff at his law firm, Baker & McKenzie; (2) redact or otherwise purge portions of an email chain between himself and a banker at JPMorgan Chase & Co., where he maintained an interest bearing escrow account; (3) preclude reference to certain incriminating statements he is alleged to have made to a colleague concerning a separate federal indictment for securities fraud; (4) preclude reference to the $16 million settlement Baker & McKenzie signed to resolve various civil claims related to his alleged role in another securities fraud; (5) preclude reference to his 1991 acquittal on federal charges in yet a third case of securities fraud; and (6) limit the type and amount of evidence that the government may introduce related to Weisberg's alleged fraud on TriState Capital.

The first type of evidence that Weisberg seeks to have precluded is that relating to his behavior around the office at Baker & McKenzie.

Apparently, Weisberg was abusive toward his secretaries at Baker & McKenzie and "cycled through" a number of them during his relatively short time at the firm. (Weisberg Mot. in-Limine (Docket Entry # 170) at 1-2.) In an interview given to the FBI, one of Weisberg's secretaries, Jodi Jones, stated that she received a standing ovation from other office staff when she completed one month working for Weisberg. (See Gov't Ex. 3500-JJ-3 (undocketed).) The implication is that she had lasted longer than any of his other secretaries. According to Jones, Weisberg was "very rude and nasty." (Id.) He cursed at Jones in front of clients and would not

7

let her take lunch.  (Id.)  Jones noted that she never saw Weisberg eat anything other than tootsie-roll lollipops, and speculated that Weisberg may have been using illegal drugs in the bathroom.  (Id.)  She also stated that she too eventually quit because she could not stand working for Weisberg, and that this was the first time she had ever quit a job without another job lined up.  (Id.)  One of Weisberg's former partners at Baker & McKenzie, Janna Bellwin, told the FBI that she once confronted Weisberg after she either learned of, or observed, Weisberg screaming at an employee in the office hallway.  (Gov't Ex. 3500-JB-2.)

Needless to say, Weisberg wants to have evidence of any of these workplace interactions precluded under Rule 403 of the Federal Rules of Evidence.  Specifically, he requests that the court "direct the government to instruct its witnesses not to reference the defendant's alleged abuse of his secretarial staff, or the fact that he cycled through a number of secretaries during his tenure at Baker & McKenzie as a result of this treatment."  (Weisberg Mot. in-Limine at 2.)  Similarly, Weisberg requests that Jones be prevented "from speculating during her testimony or otherwise casting irrelevant and unfair aspersions about the defendant's suggested drug use."  (Id.)

The government responds:

> The government assures the Court that it does not intend to dwell on what the defense characterizes as the defendant's "abusive" behavior; however, the witnesses should be permitted to testify fully about the relevant facts, which necessarily will include the manner and tone in which the defendant acted in committing the crime.  That may include, for example, the unpleasant things the defendant did and said when having his secretary alter important documents in this case.  A witnesses's narrative cannot be stripped of essential aspects during testimony without affecting the jury's perception of the [sic] whether the witness is testifying candidly.

(Gov't Response to Mot. in-Limine (Docket Entry # 194) at 2.)  The government adds that it will

instruct Jones not to share her suspicion that Weisberg used drugs. (Id.)

Reading between the lines somewhat, it appears that the government will call Jones to testify about material changes in the escrow agreement she made at Weisberg's behest, and wants her to be able to testify fully and freely about Weisberg's directives. This theory is supported by Jones's FBI interview—the majority of which is devoted to her role in revising and altering documents—and a previous submission wherein the government suggested that it will rely heavily on Jones's testimony about different versions of the escrow agreement to explain the so-called "Brady" email. (See Gov't Ltr. of Apr. 24, 2012 (Docket Entry # 191) at 3.)

In reply, Weisberg concedes that "Jones should be permitted to testify about the directions she received from the defendant in connection with the offenses charged in the Indictment," but maintains his position that the government should not be allowed to ask questions specifically focused on the "unpleasant things the defendant did and said." (Weisberg Reply (Docket Entry # 197) at 2.) He contends that, "at a minimum, . . . Jodi Jones's testimony should be elicited outside the presence of the jury first, so that the defense has the opportunity to object to inflammatory references and receive advance rulings from the Court." (Id.)

The admissibility of evidence and testimony related to Weisberg's office behavior depends largely on context. By itself, such material is not likely to be relevant and, absent special circumstances, should be excluded under Rule 402 of the Federal Rules of Evidence.[2]

---

[2] There is one possible scenario in which evidence of Weisberg's demeanor could become relevant by itself. If Jones is aggressively cross-examined about her motives in changing documents related to the escrow agreement, the government may want to elicit testimony about her relationship with Weisberg on re-direct examination. In this context, such testimony could be probative of Jones's motive to alter the documents because, to the extent it shows that Weisberg intimidated Jones, the testimony makes it more likely the Jones changed the documents at Weisberg's direction rather than on her own initiative. If this situation occurs, the court may be called upon to conduct a Rule 403 balancing test.

On the other hand, the government is correct that there may be instances in which Weisberg's hostile demeanor so infected other things he said and did that a witness could not accurately or compellingly testify about the relevant conduct without also referencing Weisberg's bad behavior. In such instances, the whole of the testimony should be admitted. Cf. United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (evidence otherwise precluded by Rule 404(b) is admissible where needed to "complete the story of the crime on trial").

What is truly inseparable from a witness's otherwise relevant testimony is a judgment call that can be only made at trial. Gratuitous or sensationalist accounts of Weisberg's antics are not admissible, and Weisberg will be free to object should any of the government's witnesses begin down this path. The court, however, takes the government at its word and believes that it will not solicit inadmissible testimony about Weisberg's demeanor. Accordingly, there is no need to burden all involved in the trial by forcing Jones to give her testimony twice.

Weisberg's second concern relates to an email chain marked as "Government Exhibit 59." The chain contains five emails between Weisberg and an assistant vice president at JPMorgan Chase & Co., Edgar S. Bronfen. In the first email, which is the main target of the Weisberg's motion, Weisberg writes:

> I am getting 210K in the attorney escrow to be wired tomorrow. I would like it invested overnight.
>
> Status of escrow interest?

(Weisberg Mot. in-Limine, Attach. (Docket Entry # 170-1).) Subsequent emails in the chain also reference the $210,000. (See id.)

The parties agree that the $210,000 referenced in that email does not pertain to this case, but they disagree about the effect of this fact. According to Weisberg, exposure to references to

10

this money will confuse the jury and "will create an unfairly prejudicial inference that the defendant may have been transferring those unrelated funds in an improper or unauthorized manner." (Weisberg Mot. in-Limine at 2.) The government argues that no prejudice will adhere, and that it is the proposed <u>redactions</u> that will cause confusion as the jury struggles to guess what material is omitted. (<u>See</u> Gov't Response to Mot. in-Limine at 2.) It contends that a limiting instruction should cure any problems related to the independent financial transaction. Weisberg responds by suggesting that the entire first email of the chain be omitted while leaving the remainder of the chain un-redacted.

The other financial transactions referenced in the email chain are irrelevant to the questions of fact before the jury, and their presence in the emails could confuse the jury. Contrary to the government's argument that redactions would tend to confuse and excite the jury, the redactions should make Government Exhibit 59 easier to understand. Unlike with Jones's potential testimony, the relevant portions of the email chain are not intermixed or otherwise dependent on the irrelevant portions. The two are easily separable. Weisberg and Bronfen used paragraph breaks and numbering to segregate the different issues they discussed in the email chain. (<u>See</u> Weisberg Mot. in-Limine, Attach.)

The parties shall therefore confer and propose redactions to those portions of the chain that the parties agree are irrelevant. To mitigate the risk that the jury will be distracted or excited by the redactions, the court will issue an instruction related to Government Exhibit 59 explaining why part of the email chain is redacted. The parties shall submit proposed language for this instruction along with their proposed redactions.

Weisberg's next three concerns all focus on evidence or testimony related to other bad

acts. (Weisberg Mot. in-Limine 3-4.) The government states that it has no intention of introducing this evidence as part of its case-in-chief, and both parties agree that it is premature to rule on its admissibility for the purposes of cross-examining Weisberg should he testify. Accordingly, the court reserves decision on these aspects of Weisberg's motion.

Finally, Weisberg moves to limit the government's use of another type of bad-act evidence—certain evidence related to his role as escrow agent for TriState Capital.

In a previous order, the court ruled that the government could introduce evidence that:

> during the time period that he served as an escrow agent to the alleged victim in this case, SIAM Capital Management, Ltd., Weisberg also agreed to be an escrow agent for TriState; that in accord with this arrangement, TriState transferred $226,000 to Weisberg for Weisberg to hold in escrow; that the signed escrow agreement required Weisberg to place the funds into a segregated non-interest-bearing bank account; but that Weisberg did not abide by the escrow agreement, instead placing the funds into an interest-bearing account; that, immediately after placing the TriState funds in the interest-bearing account, Weisberg withdrew $221,000 of the $226,000 from that account and purchased a Certificate of Deposit ("CD"); that, a short time later, the attorneys representing TriState, Russell & Fig, contacted Weisberg and directed that the funds be released from escrow; that, because Weisberg had used the money to purchase a CD, he did not have the $226,000 on hand; that, to make good on his obligation to TriState, Weisberg transferred $200,000 of the proceeds from his alleged SIAM fraud to Russell & Fig; that Russell & Fig disbursed the funds by check to TriState; that Russell & Fig then pressed Weisberg for the balance of the escrow funds—$26,000, less Weisberg's agreed upon agent's fee; and that Weisberg responded by closing the CD, moving its proceeds to the interest-bearing account, and remitting an additional $20,000 to Russell & Fig.

(Mem. & Order of Mar. 9, 2012 (Docket Entry # 167) at 4.) The court determined that some of this material is direct evidence of the elements of the money laundering charge and that the evidence is also probative of Weisberg's mental state with respect to the wire fraud charges. (See id. at 6-8.)

Now, Weisberg seeks to restrict the use of "the back and forth communications

surrounding the remaining portion of the repayment following the June 1 wire." (Weisberg Mot. in-Limine at 4.) This is evidence that, after Weisberg wired the $200,000 of allegedly misappropriated SIAM funds to Russell & Fig, the law firm pressed him for repayment of the remaining balance of the escrow account—roughly $26,000 less agency fees. Specifically, there is evidence that after Weisberg wired the initial $200,000, three weeks elapsed before he repaid the remaining funds. During this time period, Russell & Fig was apparently quite persistent in its requests for the funds, and Weisberg may have been evasive. Weisberg argues that this evidence is not probative and could be prejudicial in that Weisberg may appear unresponsive.

The government contends that this issue was settled by the court's previous memorandum and order.

To a large extent it was. In that order, the court ruled that such evidence helps "complete the story" of Weisberg's alleged money laundering. It stated that "evidence of Weisberg's subsequent payment of the remainder of the TriState escrow funds helps to explain the discrepancy between the amount of money with which Weisberg was entrusted and the size of the initial Russell & Fig wire transfer." (Mem & Order of Mar. 9, 2012 at 7.) All of the evidence that Weisberg seeks precluded may be fairly described as "evidence of subsequent payment." Obviously, if the government were to belabor the point that Weisberg did not fully repay TriState with his initial wire transfer and that the subsequent funds were slow in coming, such evidence might be unduly cumulative and thus precluded under Rule 403. This might be the case, for example, if the government were to introduce evidence or testimony solely focused on Weisberg's delay in repayment, rather than the repayment itself.

As with evidence of Weisberg's office demeanor, it is a judgment call dependent on

13

context whether the government's evidence related to repayment of the balance of escrow funds to TriState is gratuitous.  Any objection Weisberg may have with respect to this type of evidence is better lodged at trial, when the court can sense whether the government is "completing the story" or simply attempting to besmirch Weisberg's character.

Finally, the court previously ruled that, upon Weisberg's request, it will issue a limiting instruction related to the TriState Evidence.  (Mem & Order of Mar. 9 at 8.)  The main purpose of the instruction is to prevent the jury from drawing an inference of propensity from the TriState evidence (see id.), but the instruction may also address potential adverse inferences that could arise if the jury is exposed to evidence of Weisberg's delay in repayment of the remainder of the TriState funds.

For these reasons, the government's motion in-limine is GRANTED.  Weisberg is precluded from presenting evidence, asking questions, or making any reference to Jon M. Knight's criminal conviction.  Weisberg's motion in-limine is GRANTED in part and DENIED in part without prejudice.  The parties shall submit to the court by May 18, 2012 proposed redactions of those portions of Government Exhibit 59 that they agree are irrelevant.  They shall also submit proposed jury instructions that explain the reasons for the redactions of Government Exhibit 59, and a limiting instruction as to the introduction of the TriState evidence.

SO ORDERED.

Dated: Brooklyn, New York
     May 14 , 2012

          /s/
NICHOLAS G. GARAUFIS
United States District Judge